**AFFIRM; and Opinion Filed August 29, 2019.**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00588-CR

**JAYONA E. JONES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 282nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1675712-S**

## MEMORANDUM OPINION

Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Molberg

A jury convicted Jayona Jones of capital murder, and the trial court sentenced her to life imprisonment without the possibility for parole. Jones challenges her conviction on two grounds. She contends the evidence is insufficient to prove that she (1) acted in the course of attempting to commit a robbery and (2) should have anticipated a murder would be committed as the result of carrying out the plan to commit robbery. Because the evidence is sufficient to uphold Jones' conviction, we affirm the trial court's judgment.

**Background**

Jones and her boyfriend, Raul Sanchez (Raul), hatched a plan to rob John Horton (John) of money and drugs that they believed John kept in a box in his trailer home. Jones knew John and had visited his home before to provide him sexual favors. To aid them in their mission to rob John,

Jones and Raul enlisted the help of Raul's brother, Marino Sanchez (Marino), and Pedro Alarcon (Pedro). According to Jones, her part of the "team" plan "was to go into the trailer and distract John by making him believe she would have sex with him. Then, after John was sufficiently occupied, Raul would enter the trailer and steal John's drug inventory and $10,000.00 in cash [we] believed he had . . . ."

As the quartet made its way to the trailer park, with Marino driving his white Mitsubishi, Raul, a member of the Tango Blast gang who had done time in prison, told the group that he was "going to get some money" and was "going to trick his girlfriend." Jones and Raul sat in the backseat. Raul was behind the driver. Behind them, on the rear window deck, were two shotguns. In front of them, in the netted pocket behind the driver's seat, was ammunition. The guns and ammo, placed there by Marino before Raul and Jones got into the car, were readily visible to Raul and Jones.

Once the four arrived at the trailer park, Jones went inside to distract John, as planned. After telling John she was there, Jones went into the bathroom and sent Marino a text message that the side door of the trailer was open. Jones returned to the bedroom, sat on John's bed with John nearby, removed her shoes, and played music on her phone. At John's request, Jones retrieved a packaged condom and opened it.

Outside, Raul told Marino, "This dude has some money and some dope" in a box. The plan was to steal it. Marino, a methamphetamine dealer, demanded half for his participation and then offered Pedro a cut to be the getaway driver. Raul said he planned to tie up John during the robbery and Raul had rope and a knife. The two exited the car, and Raul handed Marino a shotgun and a ski mask. Raul took the other shotgun. Each was loaded with four shells. Raul put on gloves, Marino did not. Later, Jones would tell the police that she had insisted that no guns be used in the robbery and that she had asked Raul to bring a knife to frighten John.

–2–

Raul and Marino entered John's trailer, and Marino went into the bathroom immediately across from the door. John believed he heard noises and reached for his pistol—the one Jones earlier had tried to move away from him, but which he moved back. Raul headed toward John's bedroom. Marino was still in the bathroom when he heard Raul walk down the hall, open the bedroom door, and say, "You know what time it is." Gunfire erupted from John's pistol and Raul's shotgun. Raul, wounded by a pistol shot, nevertheless got off three or four rounds as John ran out of the bedroom toward the other end of the house. Raul followed, dropping his shotgun and grabbing Marino's from him as he passed the bathroom. Several more shotgun blasts followed and John lay dying on the floor from six or seven separate wounds.

Dickie Horton (Dickie) was John's brother. He lived in a house trailer nearby. He was watching the ten o'clock news with an acquaintance when he heard the unmistakable sound of gunfire. Grabbing his own shotgun, Dickie ran outside and saw several people exiting John's trailer. He encountered Raul, who pointed his shotgun at him. Dickie fired first, sending a fatal blast to Raul's head. By this time, Marino was in the car, holding the shotgun he retrieved after Raul had dropped it inside the trailer home. Dickie shot at Marino through the windshield, wounding him in his face. From behind the car, Jones screamed, "Dickie, don't shoot!" Dickie recognized her as an acquaintance of John's and retreated to John's home to help his wounded brother. Pedro took off in the car with Marino, headed to the nearest hospital. Jones left the scene on foot but then returned. Meanwhile, Dickie's friend had called 9-1-1, and police and medical personnel soon arrived. Dickie tried to assist John, who was still alive when medical personnel arrived. Those personnel placed John in an ambulance to take him to a hospital, where he died.

Among other things, police crime scene analysts found an open-bladed knife in Raul's pocket and rope protruding from his waistband. Investigation inside the house trailer revealed significant damage to the interior, including debris scattered across the television stand, except for

a distinctive area where no debris was found. Later, investigators found a box of coins in the trunk of Marino's Mitsubishi. The dimensions of the box matched the clean space on John's television stand. The box contained no drugs and no significant amount of money.

## Standard of Review

In reviewing a challenge to the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We consider all of the evidence, whether or not properly admitted. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

The factfinder is the sole judge of the weight and credibility of the evidence and witness testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). As such, it is the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. We may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry*, 4 S.W.3d at 740. Instead, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We presume the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326. The standard of review is the same for direct and circumstantial evidence cases. *Hooper*, 214 S.W.3d at 13. Circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt. *Id*.

**Applicable Law**

A person commits capital murder if he or she intentionally or knowingly causes the death of an individual in the course of committing or attempting to commit robbery or certain other crimes. TEX. PENAL CODE ANN. § 19.03(a)(2). A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. PENAL CODE § 29.02(a). The phrase "in the course of committing theft" means "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." *Id.* § 29.01(1); *see also Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980).

The State must prove a nexus between the murder and the theft, i.e., the murder occurred to facilitate the taking of property. *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex. Crim. App. 1986). In order for a murder to qualify as capital murder, the intent to rob must be formed before or at the time of murder. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). Proof of a completed theft is not required to establish the underlying offense of robbery; rather, a jury may infer the requisite intent from circumstantial evidence and from the defendant's conduct. *See Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996); *Maldonado v. State*, 998 S.W.2d 239, 243 (Tex. Crim. App. 1999).

A person can be found guilty of capital murder as a conspiring party if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators. *See* PENAL CODE § 7.02(b). If the felony actually committed was committed in furtherance of the unlawful purpose and should have been anticipated as a result of carrying out the conspiracy, then all conspirators are guilty of the felony actually committed, regardless of their intent to commit it. *See id.* "Evidence that a defendant knew his co-conspirators might use guns in

the course of the robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery." *Love v. State*, 199 S.W.3d 447, 453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

## Analysis

In her first issue, Jones asserts the evidence is insufficient to show she acted in the course of attempting to commit a robbery because there is no evidence any defendant took or attempted to take John's property. Viewing the evidence in the light most favorable to the verdict, as we must, *see Jackson*, 443 U.S. at 319, we find there is sufficient evidence from which a rational jury could conclude beyond a reasonable doubt that Jones acted in the course of attempting to commit a robbery. *See* PENAL CODE § 29.01(1); *Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980). The jury heard Jones' own statements to the police, including her admission regarding her plan to enter first and to then distract John so that Raul and Marino could then go through the other rooms. The jury also heard Jones' statements that she told Raul to bring a knife instead of guns, and heard other details from Pedro and Marino regarding the group's plan. In Jones' own brief, she admits to the group's plan and admits her own part in it, and the record reflects that once at the scene, Jones and the rest of the group acted in furtherance of their plan. Jones, Raul, and Marino entered John's home with the intent to steal money and drugs, and once Jones entered, she took steps consistent with their plan by informing them that the side door was unlocked, by entering the bedroom with John, and by taking steps to distract him, just as the group had planned. The record also includes evidence that Raul and Marino brought materials into John's home consistent with their execution of a robbery, including two loaded shotguns, ski masks, rope, and a knife. The jury heard Marino testify that immediately before he heard multiple gunshots, Raul had gone into John's bedroom with a loaded shotgun and said, "You know what time it is." *See Penn v. State*, No. 14-13-00263-CR, 2014 WL 4557878, at *1, *4 (Tex. App.—Houston [14th

–6–

Dist.] Sept. 16, 2014, no pet.) (mem. op., not designated for publication) (holding sufficient evidence of specific intent to rob when defendant pointed gun at victim and said, "You know what time it is. Lay it down," during a drug deal). Finally, the State also introduced evidence from which the jury could have concluded the box with coins found inside Marino's trunk was taken from John's television stand and placed in Marino's car. The jury heard and saw evidence that the television stand had an area noticeably free from the debris caused by the nearby gunfire that was present on the rest of the stand and that the clear space matched the box found in Marino's trunk, supporting the inference that the box with coins was removed after the gunfight. We conclude a rational jury could find Jones committed or attempted to commit robbery and resolve Jones' first issue against her.

In her second issue, Jones admits that she, Raul, and Marino planned to rob John but argues the evidence is insufficient to establish she should have anticipated John's murder as a result of carrying out their plan. She contends that she did not know Raul and Marino had shotguns and contends that there is no evidence she should have anticipated that Raul would murder John during the course of the robbery. The law does not require the State to prove John's murder was actually anticipated, but only that it should have been anticipated. *See* PEN. CODE § 7.02(b). Here, the jury heard sufficient evidence from which they could conclude Jones did anticipate or should have anticipated this result, including her own statement to the police that she told the others not to use a gun but to use a knife[1] instead, her act of pushing John's pistol away from him, and her familiarity with Raul, a gang member who had been released from prison within the last year. Finally, there was evidence from which the jury could reasonably infer that Jones was aware that guns would be used, thus supporting a conclusion that she should have anticipated the possibility of murder

---

[1] Any knife may be considered a deadly weapon if in the manner of its use, it is capable of causing death or serious bodily injury. *See* PENAL CODE § 1.07(a)(17)(B).

occurring. *See Love,* 199 S.W.3d at 447. Marino testified that before the group went to John's home, he placed the two shotguns on the rear window deck before Jones and Raul got into the backseat, and the shotguns were readily visible during the entire ride. Also, a crime scene analyst testified that the box of ammunition was visible to someone sitting in the backseat. The jury was free to reject Jones' claim that she did not know any guns were present and could have reasonably concluded Jones saw the guns and the ammunition based on her proximity to them. *See Coleman v. State*, 956 S.W.2d 98, 102 (Tex. App.—Tyler 1997, pet. ref'd) (holding defendant's knowledge that companions had guns in the car when they went to steal a Mercedes sufficient to show defendant should have anticipated resulting murder). Based on such evidence, we conclude that a rational jury could have determined beyond a reasonable doubt that Jones should have anticipated John's murder could result from carrying out the plan to commit robbery. We resolve Jones' second issue against her.

## Conclusion

Because we conclude that the evidence was sufficient to sustain Jones' conviction, we affirm the trial court's judgment.

/Ken Molberg/
————————————————————
KEN MOLBERG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

180588F.U05

–8–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

JAYONA E. JONES, Appellant

No. 05-18-00588-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 282nd Judicial District Court, Dallas County, Texas

Trial Court Cause No. F-1675712-S.

Opinion delivered by Justice Molberg.

Justices Myers and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 29th day of August, 2019.